82, O.K.'s Cascade Company versus the United States. Good morning, Your Honors. Good morning, Mr. Luke Janowitz. That's correct, Your Honor. Thank you very much. Okay. You're having a tough day today with these names, aren't you? No problem. May it please the Court, we're here today to urge the Court to overturn the decision of the Court of Federal Claims in the case of O.K.'s Cascade Company versus the United States on four discrete points. The first point is with regard to, in essence, pre-contract costs that O.K.'s expended in meeting new requirements of the 2004 solicitation for mobile kitchen units. The second category that we're asking the Court to overturn the Court of Federal Claims on is in the amounts that O.K. spent in renovating its kitchen units, K6 and K7, to meet the new requirements of the contract. Previously, the contract had had a 65-point requirement. That amount was increased to 100 points for the 2004 contract. I'm trying to understand something from your library. Are you saying that that category, that those changes were made post-contract and were dictated by contract? In other words, in the 19 days during which the contract was in place, you're saying that those changes were made then? No, Your Honor. Okay, so these are also pre-contract. These are all pre-contract, that's correct. What's the difference between the first and second points you raised? When we talk about a kitchen unit, we're talking not about one discrete piece of equipment. We're talking about several different pieces of equipment. So the first category relates to three specific items. It relates to hand-washing stations that were required in the 2004 solicitation that had not been required previously. The second requirement deals with how you serve coffee. It had to be in an enclosed structure. And the third requirement was the number of tables and chairs that you have to have and the requirements that OKs utilize to meet that particular requirement. Back to Judge Lynn's question. What's the legal distinction between that category of expenses and your other category of pre-contract? Well, not really any legal distinction. We're suggesting to the Court that these could all be pre-contract costs under precedence of the Court of Federal Claims and also this Court, or that these are costs that should have been recoverable under the applicable termination for convenience clause in the contract and the FAR regulations governing the termination for convenience, specifically FAR 49.201, which says that you don't really have to look at discrete line items. You can make a settlement that's just and fair with the contractor to enable the contractor to recover its costs, plus the precedence of this Court, specifically the Jacobs Engineering case and the Nikon Corporation case, both cases of which supported a contractor in his attempts to recover termination for convenience costs that prior to that time had not been recorded. I think it had not been authorized by this Court. I think in Nikon it was for unabsorbed overhead, and this Court said, well, if you can come up with a different allocation method, you can certainly recover that. Were all of these costs incurred as a result of the termination, or were they incurred to be more competitive in the solicitation? Well, I think it might be kind of a dual situation, Your Honor. The way that the contract works is these are very long lead time items. In order to build eight or ten hand-washing stations, you don't just go down to Lowe's and purchase the parts and then slap it together. The testimony at trial showed that we had to buy special trailers from an outfit in Spokane, Washington, ship those to our location outside of Seattle, and then make the modifications to those trailers. But those things were done in order to be competitive. They were done in order to be competitive, but they're also done to be in compliance with the requirements of the solicitation. For example, if you did not have... But the solicitation itself said that to the extent that you do anything to be in compliance with the solicitation, those are not costs that are recoverable. How do you get around that? Well, we get around that, Your Honor, by saying that if you take a look at what the solicitation required and what the reasonable expectation of a reasonable contractor in reading that solicitation was, the reasonable expectation of a contractor in reading that solicitation was not that I'm going to be making these improvements to my equipment for a 19-day contract, because otherwise I could just do this work under the EERA provision that I actually did the work under. I'm sorry, Your Honor. At the time the work was done, you had no guarantee that you were going to get the contract, right? Well, other than the fact that we'd been doing this work for 31 consecutive years, Your Honor, and that we had bid for five or six contracts along the way, OK's had also been the most successful contractor in terms of an award from this particular agency in the previous solicitation. Isn't that what this is all about? You just assumed that you would have this work forever and ever? Well, we disagree, Your Honor. No, it's not an assumption. I mean, there's a lot of things. Sometimes I commented to my client when we were talking about this case that the facts in this case are almost like they were devised by some devious law school professor, you know, in the sense that when you're dealing with the government, how would you expect that they tell you to go out and do all this work to make sure that your equipment complies with the requirements of the solicitation? Otherwise, you're not going to get an award of a contract at all. But that's your choice, though. Well, that is a choice, Your Honor. But the choice is either to comply or to get out of the business after 31 years. The choice is not to do all that work, perform for the majority of the 2004 season under the Emergency Equipment Rental Agreement, which had a completely different requirement for the equipment requirements, different than the solicitation did. Basically, there's one sentence in the Emergency Equipment Rental Agreement, and that just said your equipment has to be in good working order. Plus, the way that the point schedule was, if you were an EERA, you submitted your equipment on a CWN basis, a call when needed basis, under an Emergency Equipment Rental Agreement, you only had to meet a 65-point standard, not meet a 100-point standard. What's your injury, given that you made more money under the EERA than you would have under the original contract? Well, we think that that actually is kind of a red herring, Your Honor, in terms of we made more money under the EERA. The EERA is something that is normally short-term. In fact, the very name of the document, it's an Emergency Equipment Rental Agreement. And we don't know what the emergency was here. In fact, the very first Emergency Equipment Rental Agreement that was provided to us basically said that we have to give you this document because we, the government, are late in evaluating the offers. But nonetheless, you had the benefit of that contract, and it was quite profitable. Well, I think, to borrow a phrase from the earlier argument, you kind of have to look at this as a continuum. This is not just a one-year contract. This is a one-year contract with three option periods. But options solely at the government. Solely at the government. But the testimony at the trial was, Your Honor, that at least for the 10 years that Wade McIntyre was the vice president of the corporation, the government had never not exercised an option. For the 31 years that the foreman, Howard Sonicson, had been with the company, the government had never not exercised an option under six or seven contracts. So I think that there's a certain level of expectation that's created by that. You said at the outset you were going to raise four categories, and we've talked about two. What are the other two? The other two are the moving the kitchens around so that they could be inspected by the government. And then the final category are the settlement expenses. The Court of Federal Claims failed to award anything to the appellant in terms of settlement expenses that were incurred by the contractor in attempting to reach a termination for a convenient settlement. How far do you go on this? Is your position that you're entitled to recoup settlement expenses regardless of whether you get anything in settlement, even if it's zero? Yes, Your Honor, that's the case. The two board cases that we cited in our initial brief basically say that. Well, the one says that while we can conceive of a circumstance where your settlement proposal is so far out there and you're not entitled to anything, they say that that's not the case. They're saying even though most of the settlement was the settlement cost, that a piece of it was not. So, I mean, they didn't really go quite as far as you're saying. Well, and I don't think the dairy sales corporation cited by the government goes as far as the government said. The government said, oh, in dairy sales, you know, this court, the predecessor to this court absolutely rejected the payment of settlement expenses when the contractor didn't recover anything in the termination for a convenient settlement proposal. And in that case, it just was a proof problem more than a blanket decision by this court that there was absolutely no entitlement when there's nothing. You know, Your Honor, I think what you have to do is you kind of have to take a look once again. You can't just take the snapshot. You have to take the whole video of the situation. You know, you don't know until you actually get to trial. And especially when four other contractors, the only four other contractors, I might add, that submitted termination for convenient settlement proposals all settled their case with the government. And as a matter of fact, one of the contractors, Stewart's catering, firefighter and catering, had identical line items to the line items that we're asking this court to overturn the Court of Federal Claims on. Stewart's had line items for mobilization. Stewart's had line items for meeting the new requirements of the contract. Stewart's had line items for actually, you know, working, upgrading their kitchens to meet the 100-point requirement. But you don't know what the settlement actually covered, though, do you? Well, we do, Your Honor. It's in the appendix. We know what they asked for, but they got a lot less than they had. Well, the amount of the settlement was basically, it looked like a lump sum. We don't know. Yes, we didn't get into the settlement discussions with Stewart's, with the contracting officer when she was at trial. But the point of the matter is that the only four other contractors that submitted termination for convenient settlement proposals all received money in connection with their termination for convenient settlement proposals. And I think that kind of ties into the fact of our situation, and specifically with regard to requesting settlement expenses. You know, would a reasonable contractor have incurred the settlement expenses that they did, knowing that four other contractors that submitted termination for convenient settlement proposals to the government also received something in connection with their claim? And in one case, it was $300,000 on a $721,000 claim. Did they have different kinds of documentation? Your Honor, I don't know that the documentation really, again, we think that that's kind of a red herring in this case. The documentation may not have been presented to the contracting officer right from the very get-go. But there was a letter that was sent to the contracting officer which specifically addressed all of the things that she had asked for in her letter that she had sent to the contractor earlier. And as a matter of fact, if you take a look at that letter, she had actually said that the contractor should be removing some items from his termination for convenient settlement proposal, rather than she never requested additional information. She said you should take stuff out of your proposal. Would you like to reserve the balance of your time? Yes, Your Honor. Thank you. Very good. Mr. Schunk, good morning. Good morning, Your Honor. May I see your report? First, to address some of the issues, one particular issue that arose during counsel's argument, there was no dispute at trial. These pre-contract costs, there was no guarantee of award. Perhaps there was an assumption of award. That's unknown. What is known, what is unknown, what is known, and straight in the record is this, is that all of their executives agreed all of these costs they incurred, the moving costs, the improvement costs, all of these costs were done at okay zone risk with no guarantee of contract award. Wasn't that true with respect to the other people that you settled with, though, and yet they sought pre-contract money? It's unknown, Your Honor. But the trial court found, so the answer to that is it's not known, because what the trial court found correctly, as a factual matter, is that okay's reliance upon these other contractors is critically flawed because okay's cascade failed to establish that it is similarly situated to those contractors. So perhaps those contractors did seek similar things. Perhaps they had similar replacement contracts. Perhaps they didn't. It's unknown. What is known is that okay's failed to show that these were in distinguishing. Yeah, but to the extent that you or the lower court took the position that pre-contract activities were barred as a matter of law, then paying these others, regardless of whether they're similarly situated, for those same kinds of activities would seem to be inconsistent with that, would it not? Perhaps inconsistent, but nothing that could happen with those other contractors could entitle this contractor to an award to the United States government, Your Honor. So it could be that there were inconsistent decisions. It could be the contracting officer had other considerations. It's also correct that it's unknown what these lump sums cover. What is certain, though, is that nothing that one contracting officer does with another contractor can affect the United States' obligations toward this contractor. But that's exactly what this contractor plans. It doesn't actually assert as a legal matter much that it's actually entitled to these costs. What it says is that, well, other people got money, so therefore we should too. Are you saying the government is free to act discriminatorily one contractor to another and simply take positions with respect to some contractors that are inconsistent with positions they take with respect to others? Is the government free to do that? Free to do that. It's difficult to answer that yes or no question. Why is that so difficult? Because, again, what happens with one contractor just can't make the government liable to another contractor. That's what's particularly true in the fact that... Well, the government can't act in an arbitrary manner with respect to any particular party. So doesn't that suggest that if the government is acting one way with respect to some contractors and a different way with respect to others, that the actions that they take with regard to the contract in question may be arbitrary? It's difficult for me to agree with that, Your Honor, because there are considerations that go into the contract and offers decisions that are just absent here in terms of what those amounts were, what the contracts were, what the costs were, what type of contracts were awarded afterwards. But the point here, and I stick by this, is that it doesn't matter for this contractor. Arbitrary or not, nothing the government could have done with someone else could somehow entitle this contractor's determination for convenience. You're saying that the government could give money to somebody else, some other contractor, that the government would now say they weren't really legally entitled to, but we just decided to give them money, and then turn around and say, okay, so we're going to enforce the legal rights vis-à-vis a separate contract. I'm not saying that happens here, but yes, Your Honor, I'm saying that's true. It's that this idea that the government makes a mistake with one contractor and has to use the public fist and then compensate every other contractor, there's no basis for that. Well, isn't the underlying current here that Ocasio-Castillo believes that the government actually retaliated against them because of involvement with personnel at an earlier point in time and complaints about government personnel at earlier points in time? That's not my sense, Your Honor. I mean, it's difficult for that, given that this contracting officer who did this, John Veniglia, testified at trial. He was called by Ocasio-Castillo, and there's no indication that this contracting officer had any animosity whatsoever toward Ocasio-Castillo. Well, there is something interesting when the contract is terminated for convenience after such a very brief period of time, and then subsequently the contract is posted for small businesses only, which means that Ocasio-Castillo is no longer even eligible to bid. That certainly suggests that the government was not happy with Ocasio-Castillo. Now, I'm not suggesting that that necessarily proves some basis to complain, but there is some suggestion that there's some merit to the point that Judge O'Malley was making, is there not? Respectfully, Your Honor, I just can't agree with that. This solicitation was terminated because of that, and I forget the exact precise reason, but I think it was because of that reason, that it should have been a small business set-aside. I really can't testify as to the reason this was terminated. It was correctly decided when doing the subsequent solicitation that it was supposed to be a small business set-aside. That decision was not challenged by anyone. So I just cannot agree that that somehow implies the government was mistreating this contractor, Your Honor. It's just not supported by the record, in my view. There are two other dispositive flaws of Ocasio's claims here that we'll address. First is that there was no injury. To be clear, and this is undisputed, this contractor made $106,000 extra during 2004 than it would have made had there been no termination of this contract. It has come to court seeking a settlement cost knowing and admitting that it is in a financially better position than it could have or would have otherwise been in. That is a bar to its claims here. Second, and equally dispositive, is that the trial court's factual findings supported by the record that all of the calculations here are, quote, plainly unsubstantiated and unreliable. And that O.K.'s, quote, failed to meet its burden of proof for any of the damages that it seeks. And that's true, and there's no real argument as to why that was an error. There was no testimony in terms of... There were certainly some documents submitted in evidence. There was no testimony about that these documents were real, that they were authentic, that they were incurred for a certain cost, that they were incurred at a certain time, that they were incurred to do anything for a specific trailer. Nothing. Does the government always require expert testimony to support business records? No, Your Honor. And the government, to be clear here, never made the argument below because there was no expert testimony they can't prevail. What the position was below and what the trial court found here is that there was just no evidence supporting these numbers as being real, fact or expert. So there was no fact witness looking at these records and saying, I authorize this expenditure. I know these costs were incurred for trailer number six for a hand-washing kitchen. What was Mr. Reed's position vis-a-vis the company? He had done work for them as an outside independent individual in certain cases. I'm not actually sure that he... My memory from lawyers, he works for a law firm in Seattle, not for O.K.'s Cascade, although I don't think he's a lawyer. I think he's an accountant by trade. But he's not an O.K.'s Cascade employee. And so the court found, effectively, that there were these numbers here, but there's no indication the numbers are real and that because of that, they're unsubstantiated, unreliable, and that's not clearly erroneous and is supported by the record. And that itself is an independent bar to all of O.K.'s claims. Pre-contract costs, again, there was no guarantee of contract award. Penberthy and Integrated Logistics both hold that there must be a pre-agreement of a contract and an authorization to incur these costs for the cost to be recoverable. There's no such thing here. Finally, the issue with the settlement cost. There are several problems aside from those already mentioned. So this idea of not having substantiated numbers and having suffered no injury, all of that applies to the settlement cost. And the $106,000 extra, which would need to apply as a type of offset against the settlement cost, which themselves are only $50,000 or thereabouts. So there are a lot of preliminary problems. How can you seek an offset now when you never sought one before? I mean, for the first time, you seek an offset here essentially in a footnote. How can we consider that? An offset, I think, might be the technically... I'm not sure what the technically appropriate word is. It's really a defense to any monetary claim against the United States. What's undisputed here is that this contractor made $106,000 extra during this contract year. $106,000 for which they did work. But more than they would have... Yes, but more than they would have made during that year had they performed the same exact work for the same exact cost. So why does that act as an offset to the settlement cost? Because they benefited. Because they received a benefit from this contract's termination. It was able to charge the government more per meal for providing the exact same food to the exact same firefighter. So they're going to receive costs from the government. Well, first, in conjunction with that... Do you have any legal authority for this proposition other than that LaSalle case that isn't really on point? Well, the LaSalle case, it is a Windsor case, so it's not a CDA case. But the general proposition, I think, is well-founded in contract law that when considering damages, you take into consideration the benefits received from the brief. Yes, but settlement costs are different from damages. Settlement costs are the costs that are incurred in connection with the attempts to reach an agreement with the government. Those are different kinds of calculations. It is, Your Honor. So, no, our case is this general proposition. But I think that also applies. To the extent you've received extra money, then that extra money should go first to cover these costs. And I think that is a general proposition supported by LaSalle but also applicable here. But did the termination guarantee that they were going to make an excessive amount of money? Or was that just happenstance? It's because... I mean, they could have made half the amount, or the fact that they made a hundred and some-odd thousand dollars was not a result of the actual termination. I mean, it wasn't guaranteed by the termination. That's just the way the business played out, isn't it? Respectfully, I mean, it was the but-for approximate cause of them causing extra money. But for this termination, they don't make this extra $106,000. So we know that. Certainly, there could have been a year with no fires, and they don't make anything. But because of this termination, every time they provided a meal, they made more money than they would had there been no termination. And that matters. And that matters in calculating the termination cost and in calculating whether there's an entitlement to the settlement proposal cost. Speaking to that a little bit more directly, there are other flaws with that settlement proposal claims. Approximately $30,000 of those costs were incurred after the commencement litigation. The FAR allows there appear to be incurred. Again, these are all subject to the court's general finding that none of these numbers are reliable. So putting aside that for the moment, $30,000 was purportedly incurred after litigation. It's not recoverable. Those aren't costs incurred to a claim to a contracting officer. Regardless of the recipient of any further correspondence, the determination of settlement or litigation was with the Department of Justice, not the contracting officer. The FAR doesn't cover those costs. What's left then are these approximately purported $18,000 spent prior to submission of the initial settlement proposal. Those costs are also unrecoverable for all the reasons we discussed. And also because of the trial court's factual finding here that this proposal should have never been submitted in the first place. There's no factual merit to this. There's no legal merit to this. This contractor had notice by determination that the Forest Service anticipated a no-cost termination and went ahead and put forth a termination settlement proposal. Given that notice and given the trial court's finding that this should have never been submitted in the first place, either of those independently sufficient, but particularly together, there's no basis for doubt. Isn't it true that by the time they actually submitted this, they had at least knowledge that others had submitted settlement proposals and seeking the same types of recovery, and some had already received money? You know, I don't know if that's true. I was trial counsel for this, and so I don't remember there being any testimony that the person submitting this had knowledge that other people were being given money at the time. It could very well have occurred, but I actually don't know if that's in the record, if that's true. But as a matter of chronology, that's true? Presumably, yes. I'm only hesitating because I'm not sure of the date, but presumably that's correct, yes. There are no further questions for all of these reasons and any of these reasons the trial court's judgment should be affirmed. Thank you. Thank you very much. Mr. Lukianowicz, you have a few minutes left before we vote. Thank you very much, Your Honor. I'd like to address Judge O'Malley's point about, as a matter of chronology, yes, the contractor did know that other contractors had submitted termination for convenience settlement proposals and had recovered on the very same types of items that OK's was requesting. I'd refer the panel to the court specifically to appendix page 205. You'll see a Schedule H there from Stewart's Firefighting, Food Catering, Sink Construction for Units, $6,823.74, approximating the amount that OK's is requesting for its sink units. So as a matter of chronology, it is safe for this court to assume that OK's knew about the prior termination for convenience settlement proposals and that some of those termination for convenience settlement proposals had been resolved favorably in favor of the contractor. With regard to, I believe it was your point, Judge Lind, where you spoke about the small business set-aside, and I think Mr. Shunk may have misspoke to the court, there is in the appendix in the record evidence that the termination for convenience was not because this solicitation, this 2004 solicitation, should have been set aside as a small business administration or should have been a site for small businesses. There was testimony that there was a number of bid protests that had been submitted in connection with this particular solicitation, and as a result of those, the department made the decision to go ahead and just terminate all contracts for convenience and resort back to the EERA. Finally, with regard to Mr. Shunk's point that OK's has been compensated mightily, in terms of the EERA, I think that once again we have to take a look at the continuum aspect of this case versus taking a look at just a snapshot. In terms of, yes, maybe for this particular period of time, OK's was compensated a bit more than it would have been had its contract rates been applied for that particular period, but I have two responses to that. Number one, OK's, two days after it submitted its response to the proposal, issued this EERA. It came completely out of the blue. So what is OK's supposed to do? It negotiates an appropriate rate under the EERA,  until the contract is awarded. Number two, in terms of the continuum, OK's wasn't bargaining for a 19-day contract when it made all of these changes to its kitchen units. Do you think the EERA was a result of the termination? That was an emergency action to sort of accommodate the fact that the contract was terminated? Well, Your Honor, there's two EERAs. I mean, there's a series of EERAs that were issued during the 2004 season. Several of them came before. I mean, what we're getting to is, to what extent were the EERAs linked in any way to the contract that was terminated? The EERAs were the vehicle that the government used to procure the services because it couldn't procure them by means of a contract because it was late. As it said in the first EERA, it was late in conducting the solicitation for 2004. Then afterwards, they still needed the services. After the contract was suspended and ultimately terminated, they still needed the services in September, October, and November, and they didn't have a vehicle since they terminated the contract, so they went back to the EERAs. OK wasn't the only one that got EERAs, right? No, Your Honor. Everybody was in the same boat as the EERAs up until July 7th, which is when all the contracts were awarded. A few days later, I think it was July 16th, the contracts were suspended, and then August 18th was the date of termination. Any final points? That's it, Your Honor. Thank you very much. I appreciate it. Thank you. Thank counsel for both sides.